# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DON BRIEGER, ROBERT BECKER, ALAN BURSTIN and HARRY SCHULTZ, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> TELLABS, INC., TELLABS OPERATIONS, INC., RICHARD C. NOTEBAERT, MICHAEL J. BIRCK, and JAMES A. DITE, <br><br> Defendants. | Case No. 06 C 1882 |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Plaintiffs Don Brieger, Harry Schultz, Robert Becker, and Alan Burstin are former participants in the Tellabs Profit Sharing and Savings Plan. They filed this putative class action lawsuit for breach of fiduciary duty under the Employee Retirement Income Security Act, 29 U.S.C. § 1109 & 1132. Plaintiffs allege that defendants, who are claimed to be fiduciaries of the Plan, breached their fiduciary obligations by permitting investments in Tellabs securities when it was imprudent to do so and by disseminating misleading information to Plan participants about the prudence of investing in Tellabs securities. Plaintiffs seek to represent a class of individuals who participated in the plan between December 11, 2000 and July 1, 2003.

Defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the following reasons, the Court denies defendants' motion.

**Facts**

For the purpose of defendants' summary judgment motion, the Court views the evidence in the light most favorable to the plaintiffs, drawing all reasonable inferences in their favor. *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir. 2002).

Tellabs Operations, Inc. sponsors the Tellabs Profit Sharing and Savings Plan, a benefit plan governed by ERISA, as part of the Tellabs Advantage Program. Tellabs is the Plan sponsor and has been a named Plan administrator from 1999 to the present. The Investment Committee and the Administrative Committee were named fiduciaries of the Plan. The Tellabs Board of Directors was responsible for selecting and monitoring the members of the Investment and Administrative Committees.

The Plan is a defined contribution individual account retirement plan open to all Tellabs employees who were either participants in Tellabs' previous retirement plan prior to 1999 or have been employed with Tellabs for at least nine months, completed 1000 hours of service, and are at least twenty-one years old. *See* Pl. Resp. at 3. Eligible employees of Tellabs and its subsidiaries may participate in the Plan by making pre-tax contributions to one or more of twelve different investment options, each with varying levels of risk and potential return. Consolidated Amended Complaint (CAC) at ¶ 65.

As indicated earlier, plaintiffs' proposed class period runs from December 11, 2000 until July 1, 2003. Plaintiff Brieger worked for Tellabs from November 26, 1984 until August 24, 2001. Plaintiff Schultz worked for Tellabs from July 10, 1984 until September 6, 2002. Plaintiff Becker worked for Tellabs from December 13, 1999 until April 18, 2003. Plaintiff Burstin worked for Tellabs from January 15, 2001 until April 18, 2003. All of the plaintiffs participated

in the Plan while employed by Tellabs. The Plan held substantial interests in the common stock of Tellabs.

In December 2000, Tellabs issued a press release announcing a multi-year, $100 million sales agreement with Sprint Corporation for the TITAN 6500 system from Tellabs' TITAN optical networking line. CAC ¶ 114. On January 23, 2001, Tellabs issued another press release announcing increased fourth quarter 2000 sales and expressing optimism regarding its optical networking products. *Id.* ¶ 129. By February 5, 2001, Tellabs stock reached its high point during the proposed class period, closing at $67 per share. *Id.* ¶ 161.

On March 7, 2001, Tellabs announced that it was lowering its revenue and earnings per share expectations for the first quarter of 2001 and the rest of the year. Def. Ex. 5. A month later, Tellabs announced that it would not meet its revised first-quarter revenue and earnings guidance. Def. Ex. 6. Tellabs attributed the revised guidance to "reduced and deferred spending" by customers, and noted that "the health of our business depends on the health of our customers, and we're seeing caution from them in the current economic environment." *Id.* By April 16, 2001, Tellabs stock had declined to $35.50 per share. Def. Ex. 1.

On April 18, 2001, Tellabs announced its first quarter 2001 results, again revised its full year earnings guidance, and indicated that it anticipated restructuring and other charges. CAC ¶ 138. Tellabs also announced that due to reduced and deferred spending by major communications carriers, it was realigning its cost structure with its expectations for lower revenue growth. Def. Ex. 7. Tellabs' cost-cutting measures included exiting its SALIX line of switching products, laying off 550 workers, eliminating salary increases, and instituting a pay cut for its corporate officers. CAC ¶ 138. On May 22, 2001, Tellabs stock traded at $42.05 per

share. Def. Ex. 1.

On May 31, 2001, Tellabs announced additional restructuring charges, including a $93 million loss related to its SALIX product line and a $34 million inventory write-off. CAC ¶ 139. As a result of these losses, on June 19, 2001, Tellabs announced that it was lowering its revenue guidance for the second quarter of 2001 to $500 million, compared with prior guidance of $780 million to $820 million. CAC ¶ 141. By June 20, 2001, Tellabs stock had fallen to $16.04 per share. CAC ¶ 143. The stock continued to plummet, and by April 5, 2003, it was trading at $0.87 per share.

As a result of workforce reductions, Tellabs terminated plaintiffs' employment. Plaintiffs qualified for severance benefits under the Plan. In exchange for the severance benefits, each plaintiff signed a "General Release," which stated, in pertinent part:

> Employee releases the Released Parties . . . from any and all claims of any kind relating to or arising out of Employee's employment or the termination of that employment with Tellabs, Inc. or any of its subsidiaries or affiliates . . . .
>
> This General Release is to be broadly construed to encompass all claims of any kind or character whatsoever, whether known or unknown, and including, but without limiting the generality of the foregoing, any and all claims under . . . the Employee Retirement Income Security Act . . . . "Released Parties" means the Company, its parents, partners, predecessors, joint ventures, related companies, affiliates, divisions and subsidiaries, and their respective past and present officers, directors, agents, employees, employee benefit plans (and their plan fiduciaries and administrators).
>
> Notwithstanding the foregoing, this General Release shall not extend to the following: (a) any right to continue Employee's group health insurance coverage pursuant to COBRA; (b) any vested benefits under the Tellabs Advantage Program, the Tellabs Profit Sharing and Savings Plan, and the Tellabs Retirement Plan, a money purchase Plan; (c) any right to exercise vested stock options in accordance with the terms of the applicable stock option plan and law including, but not limited to, laws prohibiting the sale of stock while in possession of material non-public information; and (d) any rights or claims that may arise after Employee's execution of this General Release . . . .

4

*See* General Release, Def. Ex. 2B.

Tellabs gave plaintiffs, as well as other employees subject to the workforce reduction, the option of maintaining their accounts with the Plan. *See* CAC Ex. 3. Each of the plaintiffs elected to take full distribution of his Plan account in a lump sum upon leaving Tellabs' employ, thereby ending his participation in the Plan.

In their complaint, plaintiffs allege in Count 1 that defendants, each having certain responsibilities regarding the management and investment of Plan assets, breached their fiduciary duties to the Plan and proposed class by failing to prudently manage the Plan's investment in Tellabs' securities and maintaining the Plan's heavy investment in Tellabs equity when Tellabs stock was no longer a prudent investment for the Plan. Plaintiffs allege in Count 2 that defendants failed to communicate to the Plan participants complete, full, and accurate information regarding the Plan's investment in Tellabs securities sufficient to advise participants of the risks of investing their retirement savings in Tellabs stock. In Count 3, plaintiffs allege that certain defendants failed to avoid or ameliorate conflicts of interests which hindered their ability to function as independent fiduciaries with the Plan and its participants' best interests in mind. In Count 4, plaintiffs allege that certain defendants breached their fiduciary duties by failing to adequately monitor other persons to whom administration of Plan assets was delegated.[1]

Defendants have moved for summary judgment, arguing that the plaintiffs are barred

---

[1] In a separate action pending before Judge Amy St. Eve, *Johnson v. Tellabs, Inc.*, Case No. 02 C 4356, a putative class of purchasers of Tellabs stock brought suit alleging that defendants defrauded them regarding the value of the stock. The Supreme Court recently granted certiorari in the case to consider the issue of the appropriate pleading standard for federal securities claims. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 853 (2007).

from bringing suit because of the releases they signed when they left Tellabs' employment. They also argue that plaintiffs lack standing to sue under ERISA.

## Discussion

Summary judgment is appropriate when the pleadings, depositions, and other materials in the record show that there is no disputed issue of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In reviewing a motion for summary judgment, the Court must view the facts in the light most favorable to plaintiffs and draw all reasonable inferences in their favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

### 1. Effect of the releases

Defendants contend that plaintiffs are barred from bringing suit because they released all their ERISA claims when they signed the general releases and received their severance benefits. Plaintiffs argue that the releases are invalid under ERISA and that even if the releases are valid, the carve-out provisions for vested benefits and later-arising claims preserve plaintiffs' claims.

#### a. Validity of the releases

Plaintiffs argue that the releases are invalid as a matter of law because they purport to release claims for breach of fiduciary duty. Plaintiffs rely heavily on ERISA section 410, which states that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy." 29 U.S.C. § 1110(a). Plaintiffs contend that under this section the general releases they signed are void to the extent that they bar any claim for breach of fiduciary duty under ERISA.

6

The Seventh Circuit has yet to address section 1110(a) directly, but in discussing general releases in relation to contested ERISA claims, the court has favored voluntary settlements, even when they result in the waiver of an ERISA claim. *See Licciardi v. Kropp Forge Emp. Ret. Plan*, 990 F.2d 979 (7th Cir. 1993) (holding that a settlement agreement that provided for large lump sum payments released the company from all contestable claims that plaintiff knew or should have known about when release was signed and barred plaintiff's claim that lump sum payments be considered as "earnings" for calculating his pension under ERISA); *Fair v. Int'l Flavors & Fragrances, Inc.*, 905 F.2d 1114 (7th Cir. 1990) (finding that a general release barred plaintiff, the former employee, from bringing an ERISA claim or from claiming that lump sum settlement be included in determining amount of pension). Further, the Seventh Circuit has distinguished between pension entitlements, which can never be waived, and pension claims, which it explained can be waived: "A pension entitlement arises under the terms of the pension plan itself. A contested pension claim, by contrast, arises under a settlement agreement. A release may prevent a plan participant from asserting claims based on a settlement agreement, but may not bar claims based on pension entitlements." *Lynn v. CSX Transp., Inc.*, 84 F.3d 970, 975 (7th Cir. 1996).

In *Lynn*, the court addressed the anti-alienation provision of ERISA, which states that "[e]ach pension plan shall provide that benefits provided under the plan may not be alienated or assigned." 29 U.S.C. § 1056(d)(1). The Seventh Circuit held that this provision "'does not impose a bar on settlement agreements wherein pension claims are knowingly and intentionally resolved by employees. To apply the anti-alienation provision in [that way] would establish the untenable rule that ERISA prevents plaintiffs from ever entering in a settlement in a dispute over

7

lost pension benefits.'" *Lynn*, 84 F.3d at 975 (quoting *Lumpkin v. Envirodyne Indus., Inc.*, 933 F.2d 449, 455 (7th Cir. 1991)). The Court likewise finds untenable plaintiffs' contention that section 1110(a) imposes a bar on settlement agreements that involve claims for breach of ERISA fiduciary duties.

The Eighth Circuit has squarely held that in enacting section 1110(a), Congress did not intend to make an "unreasonable law – one requiring terminal litigation" rather than favoring settlement similar to general law. *Leavitt v. Northwestern Bell Tel. Co.*, 921 F.2d 160, 161-62 (8th Cir. 1990) (releases which do "not relieve a fiduciary of any responsibility, obligation or duty imposed by ERISA [but which] merely settle[] . . . dispute[s] that the fiduciary did not fulfill its responsibility or duty on a given occasion," are not barred by Section 410). The Court finds *Leavitt* persuasive. A release that, like the one in this case, settles an existing or potential claim based on past conduct does not "relieve" a fiduciary from any responsibility but rather settles a dispute over whether the fiduciary met its responsibility in a particular situation.

The Court understands the crucial role of a fiduciary in directing ERISA plans, which is why courts have also distinguished between contractual provisions that relieve Plan fiduciaries from their duties, which are invalid, and releases that resolve claims arising from the fiduciary duties, which section 1110(a) does not render invalid. *See, e.g., Packer Eng'g, Inc. v. Kratville*, 965 F.2d 174, 175 (7th Cir. 1992) (acknowledging that section 1110(a) would nullify a provision indemnifying a pension fiduciary who has been found liable for breach of his fiduciary duties); *Srein v. Soft Drink Workers Union, Local 812*, 93 F.3d 1088, 1096 (2d Cir. 1996) (section 1110(a) has not been interpreted as "prohibit[ing] a release that settles a bona fide dispute between an ERISA fiduciary and a plan beneficiary."). The releases plaintiffs signed fall into the

latter category; they resolved claims arising from possible breaches of fiduciary duties. Further, as discussed more fully below, the releases signed by plaintiffs do not relieve the fiduciaries of liability with respect to vested benefits or later-arising claims.

For these reasons, the Court concludes that section 1110(a) does not invalidate the release signed by plaintiffs.

### b. The releases' carve-out provisions

Plaintiffs contend that even if the releases are valid, they contain an express exception for claims for vested benefits. The releases are contractual arrangements, and as such, they are interpreted according to the law governing contracts where the release was signed. *See Curran v. Kwon*, 153 F.3d 481, 488, n.12 (7th Cir. 1998). The Court applies Illinois law because the releases were signed in Illinois. *Id.*

In Illinois, a release is a contract in which one party abandons claims against another. Interpretation of a release is governed by the principles of contract law. *See Farm Credit Bank of St. Louis v. Whitlock*, 144 Ill. 2d 440, 446, 581 N.E.2d 664, 667 (1991) (applying contract law to a general release); *see also Thornwood v. Jenner & Block*, 344 Ill. App. 3d 15, 21, 799 N.E.2d 756, 762 (2003) (same). The parties' intentions are determined from the document itself; if no ambiguity exists, construction of the contract is a matter of law. *Farm Credit Bank*, 144 Ill. 2d at 447.

A contractual term is ambiguous if it is capable of being understood in more than one way. *Id.* If the "court determines that a contract is ambiguous, then its construction is a question of fact and parol evidence is admissible to explain and ascertain what the parties intended." *Id.* In the absence of extrinsic evidence, the court may invoke the principle that ambiguities in a

9

contract that remain are resolved against the party who drafted the contract. *See, e.g., Weiland Tool & Mfg. Co. v. Whitney*, 44 Ill. 2d 105, 116, 251 N.E.2d 242, 248 (1969); *Bishop v. Lakeland Animal Hosp., P.C.*, 268 Ill. App. 3d 114, 117, 644 N.E.2d 33, 36 (1994).

Plaintiffs rely on language in the general release stating that it does not extend to "any vested benefits under the Tellabs Advantage Program, the Tellabs Profit Sharing and Savings Plan, and the Tellabs Retirement Plan . . . ." They argue that because the thrust of their claims is that they would have been entitled to a greater amount of vested benefits but for defendants' fiduciary breaches, the release does not bar their claims. Defendants counter that the release explicitly relinquishes claims arising under ERISA. They argue that because plaintiffs knowingly and voluntarily entered into the release and received adequate consideration in the form of their severance packages, they are now barred from bringing any claims relating to the Plan. Defendants contend that plaintiffs no longer have vested benefits because they elected to take a lump-sum payout of their benefits and that as a result, the carve-out provision for vested benefits does not save plaintiffs' claims.[2]

In a similar case, *Nelson v. Ipalco Enterprises, Inc.*, the plaintiffs participated in a voluntary early retirement program, signed a general release that released their employer from claims arising under ERISA, and received a severance package. *See Nelson v. Ipalco Enter., Inc.*, No. IP02477CHK, 2005 WL 1924332 (S.D. Ind. Aug. 11, 2005). They later filed suit under ERISA, claiming, like the plaintiffs in this case, that the plan fiduciaries had breached their duties by allowing continued investment in Ipalco stock. The defendants argued that the release

---

[2] Plaintiffs also state in their response to defendants' motion that they are ready to add a named plaintiff who elected to maintain benefits with the plan post-severance agreement. *See* Pl. Resp. at 2.

barred the plaintiffs from bringing suit under ERISA. The court held that language in the release stating that "[t]his Agreement shall not affect Employee's benefits under the Thrift Plan" created an ambiguity about the effect of the release on claims relating to the Thrift Plan. *Id.* at *5-6. The court determined that "[n]o employee signing the agreement, which said it 'shall not affect' Thrift Plan benefits, would have expected it to release the defendants from claims for breaches of fiduciary duties impairing those same benefits." *Id.* at *6. The court explained that "the benefits preserved by the terms of the agreement would have little or no value without the ability to enforce the legal rights that protect those benefits." *Id.*

The same is true in this case. There is no basis to determine, at least on the present record, that any signatory would have understood a release that expressly excepted claims for vested benefits to bar a claim that the signatory received a lower level of vested benefits as a result of defendants' fiduciary breaches.[3] The Court holds that plaintiffs' suit is not barred by the general release because the carve-out provision allows plaintiffs to protect their vested benefits under the Plan.

The Court also agrees with plaintiffs that the release exempts claims that arose after its execution. The release provides that it "shall not extend to . . . any rights or claims that may arise after Employee's execution of this General Release." Some of the named plaintiffs' claims arose, at least in part, after they signed their releases. Plaintiffs' claims involve not just the defendants' purchase of Tellabs stock, but also holding onto the stock when it became apparent

---

[3] Defendants rely on *Howell v. Motorola, Inc.*, for their argument that the releases bar plaintiffs' claims for breach of fiduciary duty. *See Howell v. Motorola, Inc.*, No. 03C5044, 2005 WL 2420410 (N.D. Ill. Sept. 30, 2005). The release in *Howell*, however, did not include a carve-out of claims for vested benefits.

11

that it was not longer prudent to do so. *See* CAC ¶ 171. The Court is unable to say that the entirety of plaintiffs' claim predates September 28, 2001, when the first named plaintiff executed his release.

For these reasons, defendants are not entitled to summary judgment based on the terms of the releases the plaintiffs signed.

## 2. ERISA standing

Defendants also contend that plaintiffs lack statutory standing to pursue their claims. To determine whether plaintiffs have standing, the Court must decide whether plaintiffs are one of the four classes of plaintiffs who may bring suit on behalf of the Plan, as contemplated by ERISA section 502(a), 29 U.S.C. § 1132(a)(2).

To bring a suit under ERISA, a plaintiff must be either a participant, beneficiary, fiduciary or the Secretary of Labor. 29 U.S.C. § 1132(a)(3). ERISA defines a plan participant as "any employee or former employee . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan." *Id.* § 1002(7). The Supreme Court has held that "the term participant is naturally read to mean either employees in, or reasonably expected to be in, currently covered employment, or former employees who have . . . a reasonable expectation of returning to covered employment or who have a colorable claim to vested benefits." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 117 (1989) (citations and internal quotation marks omitted).

The Seventh Circuit has yet to address this issue directly, but it has spoken extensively on what constitutes a "colorable claim" under ERISA and *Firestone*. Specifically, the court has noted that "[t]he requirement of a colorable claim is not a stringent one." *Panaras v. Liquid*

12

*Carbonic Indus. Corp.*, 74 F.3d 786, 791 (7th Cir. 1996). The court has explained that "[e]ven in cases where a plaintiff's claim ultimately failed, the 'possibility' of success was sufficient to establish participant or beneficiary status." *Neuma, Inc. v. AMP, Inc.*, 259 F.3d 864, 878 (7th Cir. 2001) (citing *Kennedy v. Conn. Gen. Life Ins. Co.*, 924 F.2d 698, 701 (7th Cir. 1991)). The court also noted that a determination of the "relative strength of [the] claim has often been deemed to go to the merits, not to whether standing as a participant or beneficiary was demonstrated." *Id.* at 878. Indeed, the court concluded that a colorable claim is merely one that is not frivolous. *Id.* at 878-79 and n.11.

In *Smith v. Aon Corp.*, current and former plan participants brought suit against a retirement plan and involved similar breach of fiduciary duty allegations by plan participants, including those who took final distributions from the plan. *Smith v. Aon Corp.*, ___ F.R.D. ___, No. 04C6875, 2006 WL 3490435 (N.D. Ill. Nov. 29, 2006). There, the court found that even class members who were former ERISA plan participants had standing to bring suit for breaches of fiduciary duty pursuant to ERISA §§ 409 & 502(a)(2). *Id.* at *5. The court reasoned that if defendants indeed committed the alleged breaches of fiduciary duty, and these breaches caused losses to the Plan, then the former Plan participants and beneficiaries would have received a greater amount in their final distributions. *Id.* Further, the court held, "if the Plaintiffs are ultimately successful in this suit, former Plan participants will be entitled to recover these lost funds." *Id.* The court concluded that ruling that former Plan participants in a case like this one lacked standing "would be contrary to the intent of ERISA." *Id.* (citing 29 U.S.C. § 1001(b)).

Plaintiffs in the present case allege that defendants breached their fiduciary duties and caused plaintiffs and the Plan to sustain substantial losses. In other words, plaintiffs allege, if

13

defendants had (among other things) divested the Plan's holdings in Tellabs stock when it was no longer a prudent investment, plaintiffs would have received more money in the final distribution of their Plan accounts. The Court finds the reasoning in *Smith* persuasive and holds that the former Plan participants in this case have a colorable claim to lost benefits based on defendants' alleged breaches of fiduciary duty. Because the plaintiffs have at least an arguable claim for benefits, under Seventh Circuit precedent they have standing to sue under ERISA. *See Neuma*, 259 F.3d at 879; *Riordan v. Commonwealth Edison Co.*, 128 F.3d 549, 552 (7th Cir. 1997); *Kennedy*, 924 F.2d at 700.

## Conclusion

For the reasons stated above, the Court denies the defendants' motion for summary judgment [docket no. 40]. This matter is set for status on February 21, 2007 at 9:30 a.m. for the purpose of setting a discovery schedule.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: February 13, 2007